1
2
3
4
5
6
7
8

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alexia Chavez, Daphne Hawkins, Kinnlyn Noice, Graciela Garcia, | No. CV 20-01652 PHX CDB |
| Plaintiff, | **ORDER** |
| v. | |
| Creative Impact Incorporated, dba Bandaids Show Lounge, James Zanzucchi, Mark Cumming, | |
| Defendants. | |

All of the parties have consented to the exercise of magistrate judge jurisdiction over this matter, including the entry of final judgment. (ECF No. 16). Before the Court is Defendants' motion to dismiss the Complaint for want of jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, or in the alternative, to stay all proceedings with regard to the claims of Plaintiffs Chavez, Noice, and Garcia pursuant to 9 U.S.C. § 3 (the Federal Arbitration Act) and dismiss the claims of Plaintiff Hawkins for want of subject matter jurisdiction. (ECF No. 13).

Because there is some discord within the federal courts regarding the propriety of deciding the issues presented in Defendants' motion at ECF No. 13 pursuant to Rule 12(b)(1), the Court will consider the issue of whether Plaintiffs Chavez, Noice and Garcia's claims must be arbitrated in the context of a motion to compel arbitration.

1

### I.      Motion to compel arbitration pursuant to the Federal Arbitration Act

2      Defendants correctly assert: "'A motion to compel arbitration is decided according

3 to the standard used by district courts in resolving summary judgement motions pursuant

4 to Rule 56, Fed. R. Civ. P.' *Coup v. Scottsdale Plaza Resort, LLC*, 823 F. Supp. 2d 931,

5 939 (D. Ariz. 2011)." (ECF No. 13 at 5).[1]

6

7     [1] *Coup* was a Title VII employment discrimination action brought by the defendants' employees; defendants moved to dismiss the complaint and/or to stay the matter and compel arbitration, citing both Rules 12(b)(1) and 12(b)(6). The court concluded the appropriate standard to apply to the motion to compel arbitration was that applicable to a motion for summary judgment, citing *Perry v. NorthCentral University, Inc.*, 2011 WL 4356499, * 3 (D. Ariz. Sept. 19, 2011) (in turn citing numerous cases concluding a motion to compel arbitration is resolved under the summary judgment standard of Federal Rule of Civil Procedure 56(c)), and *The O.N. Equity Sales Co. v. Thiers*, 590 F. Supp. 2d 1208, 1211 (D. Ariz. 2008). The *Perry* court reasoned, in determining the proper standard under which to consider a motion to dismiss for want of subject matter jurisdiction or, in the alternative, to compel arbitration:

    . . . the Court's [] concern herein is that portion of the motion seeking the dismissal of this action in its entirety for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*. Since NCU states that the relief it is seeking is an order dismissing Perry's claims and compelling their arbitration, the Court has construed this portion of NCU's motion as being a motion to compel arbitration pursuant to 9 U.S.C. § 4. *See FDIC v. Artesa Holdings, LLC*, 2011 WL 2669231, at *1 (D. Ariz. July 7, 2011) (Court treated a motion to dismiss for lack of subject matter jurisdiction that was based on the existence of a binding arbitration clause as a motion to compel arbitration under the FAA); *Service Employees International Union, Local 707 v. Connex–ATC*, 2006 WL 2975591, at *2 (N.D. Cal. Oct.18, 2006) (Court, noting that the existence of an arbitration provision did not deprive it of subject matter jurisdiction, construed a motion to dismiss for lack of subject matter jurisdiction as a motion to compel arbitration pursuant to the FAA.); *cf. Craft v. Campbell Soup Co.*, 177 F.3d 1083, 1084 n.4 (9th Cir.1998) (Court treated a motion for summary judgment as a de facto motion to compel arbitration), *abrogated on other grounds by Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 [] (2001). The Court has applied a summary judgment-type standard in resolving NCU's motion. *See e.g.*, *Aliron International, Inc. v. Cherokee Nation Industries, Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008) ("The district court properly examined CNI's motion to compel arbitration under the summary judgment standard of Federal Rule of Civil Procedure 56(c), as if it were a request for summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate."); *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2nd Cir. 2003) ("In the context of motions to compel arbitration under the Federal Arbitration Act . . ., the court applies a standard similar to that applicable for a motion for summary judgment."); *Kaneff v. Delaware Title Loans, Inc.*, 587 F.3d 616, 620 (3rd Cir. 2009) (same). A trial is necessary under the FAA only of there is an issue of fact as

Plaintiffs assert causes of action pursuant to the Federal Labor Standards Act ("FLSA") and state law. Plaintiffs assert: Defendants failed to pay them the federal minimum wage and failed to pay overtime wages, in violation of 29 U.S.C. §§ 206 and 207; unlawfully took their tips in violation of 29 U.S.C. § 203; required Plaintiffs to pay illegal kickbacks in violation of 29 U.S.C. § 203(m) (citing 29 C.F.R. § 531.35); forced them to share their tips in violation of § 203(m) (again citing 29 C.F.R. § 531.35); violated Arizona's Minimum Wage Act, codified at Arizona Revised Statutes Annotated §§ 23-363 to 23-365, i.e., failed to pay them the state minimum wage and failed to pay wages due Plaintiffs. (ECF No. 1 at 17-23). In their prayer for relief Plaintiffs seek compensatory damages of "at least $100,000;" special damages; "restitution of unpaid monies;" attorneys' fees and costs; statutory penalties; pre- and post-judgment interest; general damages; declaratory and injunctive relief; "an amount equal to wages owed, interest thereon, and an additional amount equal to twice the underpaid wages. A.R.S. § 23-364(G);" and "an amount equal to the unpaid wages under the Arizona Wage Act and an additional amount equal to three times the underpaid wages. A.R.S. § 23-355(A)." (ECF No. 1 at 23-24).[2]

Plaintiffs' Complaint asserts they performed as entertainers at Defendants' business Bandaids ("the Club"), "an adult-oriented entertainment facility," from approximately 2017 until approximately 2020. (ECF No. 1 at 7). Plaintiffs assert during this time period they were denied minimum wage payments and denied overtime wages "as part of Defendants' scheme to classify Plaintiffs and other dancers/entertainers as 'independent

---

to the making of the agreement for arbitration, 9 U.S.C. § 4, and the Court, viewing the evidence of record and all reasonable inferences from that evidence in Perry's favor, concludes that Perry has not raised any significant issue of material fact directed at the enforceability of the arbitration agreements he signed.

*Perry v. NorthCentral Univ., Inc.*, 2011 WL 4356499, at *3 (D. Ariz. Sept. 19, 2011).

[2] The Complaint also states: "Plaintiffs bring a collective action to recover the unpaid overtime compensation and minimum wage owed to them individually and on behalf of all other similarly situated employees, current and former, of Defendants in Arizona. Members of the Collective Action are hereinafter referred to as 'FLSA Collective Members.'" (ECF No. 1 at 3, *see also* ECF No. 1 at 16-17).

contractors.'" (ECF No. 1 at 2). Plaintiffs assert: "At all times during the four (4) years prior to the filing of the instant action, Defendants categorized all dancers/entertainers employed by Defendants as 'independent contractors' and have failed and refused to pay wages to such dancers." (ECF No. 1 at 7).  The Complaint alleges Defendants exercised control over the terms and conditions of Plaintiffs' performances, *inter alia*, by setting Plaintiffs' working hours; controlling the music to which Plaintiffs danced; retaining "the authority to suspend, fine, fire, or otherwise discipline entertainers for non-compliance with their rules regarding dancing;" and requiring Plaintiffs to comply with dress and appearance standards. (ECF No. 1 at 9). Plaintiffs allege they were "compensated exclusively through tips from Defendants' customers," and that Defendants required Plaintiffs "to share their tips with Defendants and other non-service employees who do not customarily receive tips, including the managers, house moms, disc jockeys, and the bouncers." (*Id.*). Additionally, Plaintiffs contend "Defendants evad[ed] the mandatory minimum wage and overtime provisions of the Fair Labor Standards Act ('FLSA'), 29 U.S.C. §§ 201, *et seq*, charging illegal kickbacks and illegally absconding with Plaintiffs' tips." (ECF No. 1 at 2).

In lieu of an answer to the Complaint Defendants filed the pending motion to dismiss or in the alternative to compel arbitration, asking the Court to order this matter to arbitration. (ECF No. 13 at 5). Defendants assert that, despite "an exhaustive review of the Club's records," they have "verified" that Defendant Hawkins "never in fact performed at Bandaids." (ECF No. 13 at 2). Defendants also assert Defendants Chavez, Garcia, and Noice each declined an "in-writing offer to perform as employees of the Club," and that Plaintiffs' claim that Defendants "misclassified them as nonemployees" is not, therefore, well-taken. (*Id.*). Defendants further allege Plaintiffs "each signed agreements with the Club containing fully-enforceable arbitration provisions." (*Id.*).

Attached to the motion to dismiss are agreements signed by Plaintiff Chavez in 2018 (ECF No. 13-1 at 7-17), by Plaintiff Garcia in 2017 (ECF No. 13-1 at 18-26), and by Plaintiff Noice in 2017 (ECF No. 13-1 at 21-36). Each Plaintiff signed a "Business Status

Selection By Entertainer (And Offer of Employment)" ("Business Status Selection"), and each Plaintiff also signed an "Entertainment License Agreement" ("License Agreement").

The Business Status Selection specifically delineates "the general differences of the two distinct arrangements under which [Plaintiffs could] perform at the Club," i.e., either under "Independent Professional Entertainer Status" or "Employee Status." (ECF No. 13-1 at 7, 18, 26). The Business Status Selection delineates the differences in methods of payment, the relative benefits of each status, and encourages the individual to think about their options and consult an attorney and/or an accountant before electing their status. (*Id.*).

The Business Status Selection advises, *inter alia*:

> As a result of our review of your application, interview, and audition, the Club would like to offer you the opportunity to perform here. However, as you may know, there have been a number of lawsuits around the country in which exotic dance entertainers have complained that nightclubs where they performed had misclassified them as "independent contractors" instead of as employees. We want **YOU** to make the decision as to the way that **YOU** want to perform at this Club. You can do so either as: 1) an INDEPENDENT PROFESSIONAL ENTERTAINER; or 2) an EMPLOYEE.
>
> We have listed below some of the general distinctions between performing here as an Independent Professional Entertainer or as an Employee. This document is not intended to provide legal or tax advice, and is merely a summary of general information.
>
> ***
>
> After reviewing this information, we would like you to select the circumstances under which you want to perform at this Club. The Club management expresses **no opinion** on this matter, and we will be happy to have you perform here under **either** structure. This is **your choice** to make. The Club will rely upon the selection you have made at the end of this document, and will offer you the opportunity to enter into the business arrangement that **YOU** selected.

(*Id.*) (emphasis in original).

The Business Status Selection then explains that "employees" would be "at will" employees, and would be paid a hourly minimum wage ("in accordance with §203(m) of the Fair Labor Standards Act and applicable state law, the legally permitted 'tip-credited' wage.") (*Id.*). As an employee, if the dancer did not earn at least the full minimum wage

"through wages and retained tips," "the **Club** would pay you the difference so that you would earn the full minimum wage for each hour worked." (*Id.*) (emphasis in original). Additionally, employees were required to "tip out," i.e., contribute to a "tip pool" distributed to "non-dancer regularly tipped employees." (ECF No. 13-1 at 8-9, 18-19, 27-28). With regard to dancers who elected to be employees, all Entertainment Fees would "belong to the Club;" the Club would withhold taxes; and as an employee the dancer would be required, "by law, [to] report all of your tip income to the Club" and the dancer would be taxed on their tip income. (ECF No. 13-1 at 8, 18, 27) (emphasis in the original). Furthermore, *inter alia*: depending on the number of hours worked an employee could be eligible for paid vacation; an employee would be required to wear "costumes selected by the Club" and the costumes would be provided by the Club; and an employee would be required at the direction of management to give "'free'" dances to customers. (ECF No. 13-1 at 8-9, 18-19, 27-28). The Business Status Selection notes that, if a dancer elected the status of an employee, they might be entitled to unemployment compensation benefits if laid off or fired from their job. (ECF No. 13-1 at 9, 19, 28). The Business Status Selection specifically states that a dancer electing status as an employee would also be "entitled to certain legal protections under the Fair Labor Standards Act." (*Id.*).

In contrast, if the dancer opted for status as an Independent Professional Entertainer, they would enter into a written contract with the Club and the Club could not terminate the contract during the life of the contract "except upon the limited reasons identified in the contract." (ECF No. 13-1 at 8, 18, 27) The Business Status Selection notes that, with regard to Independent Professional Entertainer status ". . . all of your earnings will come directly from your customers. YOU WILL <u>NOT</u> RECEIVE ANY PAY FROM THE CLUB, EITHER BY WAY OF AN HOURLY WAGE OR A SALARY," (*id.*), and that "all tips that you earn (gratuities paid by a customer ***over and above*** the posted Entertainment Fees, as well as stage tips) are yours to keep. You will not be required to share your tips, or 'tip out,' to anyone." (*Id.*) (emphasis in original).

As an "Independent Professional Entertainer" the dancer would keep their own "entertainment fees," be responsible for reporting their income, and be responsible for "taking care of and paying all taxes and other withholdings due on [their] income." (*Id.*). Independent Professional Entertainers were not required to provide free dances to customers, were not entitled to paid vacation or overtime pay, and could choose and would provide their own costumes. (ECF No. 13-1 at 8-9, 18-19, 27-28). The Business Status Selection specifically states:

> By selecting Independent Professional Entertainer status, you will be acknowledging that you understand that you are not entitled to benefits under the Fair Labor Standards Act (minimum wage and overtime laws, among other things). the National Labor Relations Act, the Equal Employment Opportunity laws, or other laws that protect employees, and that you will not be afforded any employee benefits.

(ECF No. 13-1 at 9, 18, 28).

As Plaintiffs Chavez, Noice, and Garcia each elected to perform at the Club as an Independent Professional Entertainer, each of them also signed a License Agreement. The License Agreement states: "**THIS IS A LEGAL CONTRACT. DO NOT SIGN IT UNLESS YOU FULLY UNDERSTAND AND AGREE TO ALL OF ITS TERMS (<u>AND PLEASE NOTE THAT THIS CONTRACT CONTAINS AN AGREEMENT TO INVIDUALLY ARBITRATE DISPUTES AND CLAIMS WHICH IS FOUND IN PARAGRAPH 21).</u>**"(ECF No. 13-1 at 11, 21, 30) (emphasis in original). The License Agreement contains the following provision: "**Entertainer** acknowledges that the **Club** has offered to hire her as an employee, but that she has **<u>REJECTED</u>** that offer and desires, instead, to perform as an Independent Professional Entertainer under the terms of this **Licensing Agreement**." (ECF No. 13-1 at 12, 22, 31) (emphasis in original). The License Agreement then reiterates that by entering into the Licensing Agreement the parties were disavowing any employment relationship, and that the "Entertainer" understood they would not be provided any wage or "other employee-related benefits." (*Id.*) (emphasis removed). The License Agreement then reiterates that, if the Entertainer had opted for status as an employee, they would be entitled to a minimum wage but that by signing the

Licensing Agreement they were representing that they did not desire to perform at the Club as an employee. (ECF No. 13-1 at 12-13, 22-23, 31-32).

The Licensing Agreement provides:

**IN ORDER TO RESOLVE DISPUTES THAT MAY ARISE OUT OF YOU PERFORMING AT THIS CLUB, THE CLUB HAS ESTABLISHED A PRIVATE "ARBITRATION" PROCESS SET OUT IN SECTION 21. ARBITRATION IS SIMILAR TO A COURT PROCEEDING, BUT IT'S LESS FORMAL, LESS TIME-CONSUMING, AND CAN BE LESS EXPENSIVE THAN GOING TO COURT.**

(ECF No. 13-1 at 14, 24, 33).

The License Agreement states: "Subject only to the provisions of the F.A.A. [Federal Arbitration Act] and this paragraph 21, the arbitrator shall have exclusive authority to resolve any disputes over the formation, validity, interpretation, and/or enforceability of any part of this license agreement, including the arbitration provisions contained in this paragraph 21." (ECF No. 13-1 at 14-15, 24-25, 33-34) (emphasis removed). The License Agreement signed by each Plaintiff further states:

Each party shall initially be responsible for their own attorney fees and out-of-pocket costs associated with the arbitration proceeding. The actual costs of arbitration (the arbitrator's fees and related expenses) shall be borne equally by the entertainer and the Club unless applicable law requires the arbitrator to impose a different allocation.

(ECF No. 13-1 at 15, 25, 34) (emphasis removed, i.e., bold, underline, all capital letters).

Additionally, the License Agreement states: "**<u>IF YOU DO NOT DESIRE TO RESOLVE DISPUTES THAT MAY COME UP IN THE FUTURE THROUGH ARBITRATION, YOU MAY EXCLUDE YOURSELF FROM THIS PROCESS BY FOLLOWING THE STEPS SET OUT IN SECTION 21(H) BELOW.</u>**" (ECF No. 13-1 at 14, 24, 33) (emphasis in original).

The relevant portion of Paragraph 21 of the License Agreement provides:

**<u>YOU ARE NOT REQUIRED TO AGREE TO THIS ARBITRATION PROCESS</u>. IF YOU WOULD LIKE TO BE EXCLUDED FROM PARTICIPATING IN AND RECEIVING THE BENEFITS OF**

**ARBITRATION, YOU NEED TO LET US KNOW OF YOUR CHOICE TO BE EXCLUDED, <u>IN WRITING</u>, WITHIN THIRTY (30) DAYS OF YOU SIGNING THIS LICENSE AGREEMENT. YOU CAN DO THIS BY RETURNING THE "ARBITRATION OPT OUT FORM" THAT ACCOMPANIES THIS LICENSE AGREEMENT BY MAIL AT THE ADDRESS SET OUT ON THAT FORM.**

(ECF No. 13-1 at 14-15, 24-25, 33-35) (emphasis in original).

The License Agreement also specifies:

If at any time **Entertainer** believes that – irrespective of the terms of this **License Agreement** – she is being treated as an employee by the **Club** or that her relationship with the **Club** is truly that of an employee, **Entertainer** shall immediately, **<u>but in no event later than three business days thereafter</u>**: i) provide notice to the **Club** <u>in writing</u> of her demand to be fully treated as an employee consistent with the terms [of this agreement] and applicable law; and ii) begin reporting all of her tip income to the **Club** on a daily basis (such tip reporting being legally required of all regularly tipped employees). The **Club** shall then convert **Entertainer** to an employee consistent with the provisions of [] this **License Agreement** and the "Employee Status" provisions of the Busines Status Selection by Entertainer document previous signed by **Entertainer**.

(ECF No. 13-1 at 13, 23, 32) (emphasis in original). The agreement then also allows a dancer to "convert to being an employee-entertainer" "at any time," by giving the Club written notice. (*Id.*).[3] Finally, the License Agreement also contains a severability clause. (ECF No. 13-1 at 14, 24, 33).

Plaintiffs Chavez, Noice, and Garcia do not dispute that they signed the Business Status Selection and License Agreements, but contend Defendants cannot enforce the

---

[3] The License Agreement also provides:
Entertainer and the club agree that any and all claims that they may have against the other (and/or against any persons or entities associated with the other party), shall be brought and maintained individually by that party in arbitration; that they will not consolidate their claims with those of any other person or entity; that they will not seek class, collective, or representative action treatment for any claim; and that they will not participate, in order to resolve a claim, in any class, collective, or representative action against the other party (and/or against persons or entities associated with the other party.
(ECF No. 13-1 at 15, 25, 34) (emphasis deleted).

License Agreement against Plaintiffs Chavez, Noice, and Garcia because it "contains an unconscionable provision as to the payment of arbitration costs and fees," i.e., a requirement that the parties initially bear the costs of arbitration equally, "regardless of how exorbitant those costs may be." (ECF No. 21 at 3). Plaintiffs contend a contractual mandatory arbitration clause is not enforceable when an equal division of costs of arbitration would be unduly burdensome on a plaintiff when compared to the costs of litigating in court. (ECF No. 21 at 4-5). Plaintiffs quote a decision issued by a California state court for the proposition that: "'[W]hen an employer imposes mandatory arbitration *as a condition as employment*, the arbitration agreement or arbitration process cannot generally require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court.'" (ECF No. 21 at 4) (emphasis added), *quoting without the original emphasis on "type" Armendariz v. Foundation Health Psychare Serv., Inc.*, 24 Cal. 4th 83, 110-11 (Cal. 2000).[4] Plaintiffs do allow that "unconscionable provisions are routinely severed when appropriate," citing *Longnecker v. American Express Co.*, 23 F. Supp. 3d 1099, 1111-12 (D. Ariz. 2014).

Plaintiffs argue:

> Plaintiffs would be responsible for substantial filing fees, final fees, and costs such as arbitrator compensation that would likely be thousands of dollars, which they would not face in court, all for claims requesting the payment of minimum wage. Plaintiffs cannot afford those costs as exotic dancers when all they are seeking to recover are their past wages. While arbitration agreements can be deemed enforceable and serve public policy purposes, unconscionable arbitration agreements are not enforced. The Agreement is clearly unconscionable and this Court must not permit Defendants to hide the ball, engage in gamesmanship, and to take money away from Plaintiffs when all she seeks is a living wage and compensation for hours worked.

(ECF No. 21 at 5). Plaintiffs contend:

> Someone seeking to remedy a minimum wage claim should not be required to pay, up front, thousands of dollars. Even the Lochner-era Court would blush at such a dystopian alternative to having one's day in court. If subject

---

[4] The Court notes the License Agreement, and its arbitration provision, were a term of conducting a relationship with the Club as an independent contractor and signing the License Agreement was not a condition of conducting a relationship with the Club as an employee.

1
2
3

to the arbitration clauses, to even begin litigating their wage claims, Plaintiffs will have to spend potentially tens of thousands of dollars in arbitration solely because Defendants had all the bargaining power in forcing Plaintiffs to agree to the arbitration provision.

4

(ECF No. 21 at 7).

5
6
7
8
9
10
11
12

        Plaintiffs assert that enforcing the arbitration provision against Plaintiff Garcia would be unduly burdensome and unconscionable because the ramifications of the COVID-19 pandemic, and her inability to afford "outside child care," have frustrated her ability to find employment and she has been unemployed since May of 2020. (ECF No. 21 at 6). Plaintiff Garcia avers that, due to her employment situation, she "cannot afford the fees or expenses for arbitration. [] She cannot afford any costs, including filing fees, associated with arbitration which would exceed [what] would be expected in state or federal court." (*Id.*).

13
14

        Plaintiff Garcia declares in an affidavit attached to the response to the motion to dismiss:

15
16

I understand that my costs and expenses [with regard to arbitration] are extremely likely to be in the thousands of dollars, and that I will not be awarded attorney's fees and costs if I am not successful in my claims.

17

                         \*\*\*

18
19
20

Several attorneys have entered their appearances for the plaintiffs in my case, and while I am not sure of the regular hourly fee of all of the attorneys, I understand that each charges in the hundreds of dollars per hour. I understand that the estimated attorney's fees and costs in this case are likely to go into the tens of thousands of dollars, if not higher.

21
22

(ECF No. 21-1 at 2-3). Included in Plaintiff Garcia's affidavit is an itemization of her monthly living expenses in the amount of $2422 per month. (ECF No. 21-1 at 3).

23
24
25
26
27
28

        The Federal Arbitration Act establishes a federal policy favoring arbitration and, accordingly, the Court must resolve any doubt concerning the arbitrability of a particular dispute in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("*Moses*"); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 983 (9th Cir. 2017). The Court's inquiry focuses on two questions, i.e., "whether a valid agreement

to arbitrate exists" and "whether the agreement to arbitrate encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). *See also* 9 U.S.C. § 4, *and Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008). If the answer is "yes" to both questions, an agreement to arbitrate must be enforced. *Chiron Corp.*, 207 F.3d at 1130. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). Additionally, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91-92 (2000) ("*Randolph*").

The Court is not at liberty to decide the unconscionability of the License Agreement as a whole; this is for an arbitrator to decide. *See, e.g.*, *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72-73 (2010) (finding no matter the validity of the contract, it is only the validity of the arbitration provision that is necessary for enforcement). Accordingly, the Court may only address whether the License Agreement's requirement that the parties arbitrate disputes is unconscionable.

State law determines whether the parties entered into a valid agreement to arbitrate disputes, and unconscionability is determined according to state laws of contract formation. *E.g.*, *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996); *Chalk v. T-Mobile USA, Inc.*, 560 F.3d 1087, 1092 (9th Cir. 2009). Accordingly, Plaintiffs' contention that the License Agreement and its arbitration provisions are unconscionable must be resolved by reference to state law. It is a plaintiff's burden to establish unconscionability and it is "a high bar to meet." *Coup v. Scottsdale Plaza Resort, LLC.*, 823 F. Supp. 2d 931, 947 (D. Ariz. 2011). *See also Effio v. FedEx Ground Package*, 2009 WL 775408, * 3 (D. Ariz. Mar. 20, 2009).

Pursuant to Arizona law, there are two types of contractual unconscionability, i.e., substantive and procedural. *See, e.g.*, *Nelson v. Rice*, 198 Ariz. 563, 567 (Ariz. Ct. App.

- 12 -

2000). "Procedural unconscionability addresses the fairness of the bargaining process, which is concerned with unfair surprise, fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should." *Duenas v. Life Care Ctr. of Am., Inc.*, 236 Ariz. 130, 135 (Ariz. Ct. App. 2014) (internal quotation marks omitted). *See also Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013).

> Under the procedural rubric come those factors bearing upon . . . the real and voluntary meeting of the minds of the contracting party: age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question.

*Maxwell v. Fidelity Fin. Serv., Inc.*, 184 Ariz. 82, 89 (Ariz. 1995) (citation omitted). Additionally, the Court may consider "whether the contract was separate from other paperwork, whether the contract used conspicuous typeface, and whether the contract was signed hurriedly and without explanation in emergency circumstances." *Duenas*, 236 Ariz. at 135.

Plaintiffs were not immature and had presumably been employed prior to their business relationship with Defendants. Both the Business Status Selection and the License Agreement were written in clear and simple language, with a notable absence of fine print and legal terminology. Both agreements thoroughly explained (somewhat repetitively) the choice Plaintiffs were making with regard to being classified as "employees," with the benefits arising from that status (most notably being entitled to a minimum wage and recourse to the guarantees of the FLSA), or as an "Independent Professional Entertainer" (the equivalent of an independent contractor). Although Defendants drafted both agreements, they did not have superior bargaining power. Per the Business Status Selection Plaintiffs would have been hired had they opted to be classified as employees and they could have elected to be classified as an employee at any time during the business relationship. As employees Plaintiffs would not have been subject to any arbitration agreement. The License Agreement's provisions regarding arbitration were not in

infinitesimally small type or buried in an obscure place in the agreement, and there is no indication in the record that either agreement was signed hurriedly and without explanation of its contents. Plaintiffs were also provided, in the License Agreement itself, the ability to opt-out of the arbitration provision at any time. Additionally, Plaintiffs could have chosen simply to perform at another venue (i.e., chosen an "alternative sources of supply for the goods," or employment, "in question"); Defendants' club was not, presumably, the only exotic dance venue in the Phoenix area. Accordingly, Plaintiffs fail to establish that the arbitration provision in the License Agreement was procedurally unconscionable.

"Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." *Harrington v. Pulte Home Corp.*, 211 Ariz. 241, 252 (Ariz. Ct. App. 2005). Finding an arbitration clause unconscionable based on costs of arbitration assigned to a party requires a factual finding that the costs of arbitration would effectively close the arbitration forum to a prospective litigant, i.e., the costs of arbitration would be so "prohibitive" as to "preclude" the litigant from an effective vindication of her rights in the arbitral forum. *Randolph*, 531 U.S. at 90; *see also American Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013); *Clark v. Renaissance W., LLC*, 232 Ariz. 510, 512 (Ariz. Ct. App. 2013) ("The party seeking to invalidate an arbitration agreement . . . has the burden of proving that arbitration would be prohibitively expensive."). The relevant inquiry must be taken on a case-by-case basis, relying on "individualized evidence to establish that the costs of arbitration are prohibitive." *Harrington*, 211 Ariz. at 252, *citing Randolph*, 531 U.S. at 91-92.

"To show this type of unconscionability, the party challenging the arbitration agreement must present specific, non-speculative evidence regarding several factors." *Duenas*, 236 Ariz. at 136. "First, the party seeking to invalidate the arbitration agreement must present evidence concerning the cost to arbitrate." *Clark*, 232 Ariz. at 513. "Second, a party must make a specific, *individualized* showing as to why he or she would be financially unable to bear the costs of arbitration." *Id.* (emphasis added). This evidence must consist of more than conclusory allegations that a person is unable to pay the costs of

arbitration. *Harrington*, 211 Ariz. at 253. To satisfy this part of the test a party must show that, based on her specific income and assets, she is unable to pay the likely costs of arbitration. *Id. See also Clark*, 232 Ariz. at 513. This evidence cannot be speculative; it must be based on specific facts showing with reasonable certainty the likely costs of arbitration. *Randolph*, 531 U.S. at 91-92; *Harrington*, 211 Ariz. at 252. "Third, a court must consider whether the arbitration agreement or the applicable arbitration rules referenced in the arbitration agreement permit a party to waive or reduce the costs of arbitration based on financial hardship." *Clark*, 232 Ariz. at 513.

The *Randolph* opinion recognized that the existence of large arbitration costs could preclude a litigant from effectively vindicating her rights, but also found any proof of those costs absent from the record in that matter. *See* 531 U.S. at 81. Thus, the Supreme Court deemed the "risk" of prohibitive costs "too speculative to justify the invalidation of [the] arbitration agreement" in that matter. *Id.* at 91. The Arizona courts have followed this approach, requiring the party opposing arbitration to demonstrate that arbitration would be "'*prohibitively* expensive.'" *Harrington*, 211 Ariz. at 252-53 (emphasis added), *quoting Randolph*, 531 U.S. at 92. In *Harrington*, the Arizona Court of Appeals rejected the argument that an arbitration clause was substantively unconscionable because the party seeking to avoid arbitration failed to present "individualized evidence to establish that the costs of arbitration [were] prohibitive." 211 Ariz. at 252.[5] The Arizona court held that, although several of the parties seeking to avoid arbitration submitted affidavits stating they could not afford the costs of arbitration, "the allegation that the arbitration clause is substantively unconscionable on [that] record [was] speculative at best." *Id.* In contrast, in *Clark* the state court held that an arbitration agreement was substantively unconscionable due to an estimated $22,800 in arbitrators' fees plus costs, established on the record, and because there was no opportunity for cost reduction or a deferral for hardship. *See* 232

---

[5] In *Harrington*, evidence showing approximately $12,000 in arbitration costs plus additional arbitrators' fees, accompanied by the mere assertion that the costs were prohibitive, was insufficient to establish substantive unconscionability. *See* 211 Ariz. at 253.

Ariz. at 514-15. *See also Estate of Harmon v. Avalon Care Ctr.-Scottsdale, L.L.C.*, 2015 WL 302292, at *3 (Ariz. Ct. App. Jan. 22, 2015).[6]

Plaintiffs fail to satisfy the first portion of the relevant test because they fail to present any specific estimation of the arbitration costs. The second portion of the test requires each party "to make a specific, *individualized* showing as to why he or she would be financially unable to bear the costs of arbitration. *Clark*, 232 Ariz. at 513 (emphasis added). This evidence must consist of more than conclusory allegations that a person is unable to pay the costs of arbitration. *Id.*  Although a single Plaintiff in this matter avers she has no asserts and that she cannot afford to pay her portion of the arbitration costs, the record contains no showing regarding the assets of the other two Plaintiffs or even a conclusory allegation regarding these two Plaintiffs' ability to pay the costs of arbitration. Plaintiff Garcia's affidavit indicates a belief that it is "extremely likely" she will incur "tens of thousands of dollars" in "costs and expenses," in addition to the arbitrator's "hourly

[6] The court in *Estate of Harmon* noted:

At the hearing, Patrick's expert Jeffrey Victor testified regarding the fees the estate would likely incur under binding arbitration. Specifically, Victor testified that Phoenix-area arbitrators charge between $300 and $475 per hour, and arbitrators with expertise in long-term care charge at least $400. As to the minimum length of time that would be needed to present the case, Victor testified it would likely take seven to eight days. In addition, Victor also testified that based on the complexity of the case Patrick would need to call seven or eight expert witnesses, including a pulmonologist, nursing standard of care expert, certified wound care nurse, geriatrician, wound care doctor or plastic surgeon, administration expert, director of nursing expert, and pathologist. He further testified that because those experts would all be testifying on different issues there would be no violation of the one expert per issue rule.

Under the arbitration agreement, Patrick and Avalon would be responsible for selecting and paying the fees and expenses of their own selected arbitrator, and both parties would select and split the cost of a third neutral arbitrator selected from "a list of individually approved arbitrators utilized by the State." Even assuming a shorter arbitration hearing of five days and one day for pre-matters, deliberations, and reading pleadings, Victor testified that the total arbitrators' fees alone would be approximately $57,000, of which $28,500 would be Harmon's estate's responsibility. Avalon offered no evidence below as to the costs of the arbitration and argues on appeal that Victor's testimony overstated the arbitrator's costs.

*Estate of Harmon v. Avalon Care Ctr.-Scottsdale, L.L.C.*, 2015 WL 302292, at *4 (Ariz. Ct. App. Jan. 22, 2015) (affirming trial court's finding that under these facts an agreement requiring arbitration of the dispute unconscionable).

rate" and "filing fees," if this matter is arbitrated, but the affidavit further states that "estimated attorney's fees and costs in this case are likely to go into the tens of thousands of dollars, if not higher," and that the fees and costs involved in arbitration "would exceed [what] would be expected in state or federal court." (ECF No. 21-1 at 2-3).

Plaintiffs have not established what arbitration costs or fees might be incurred, let alone have they show that arbitration would be prohibitively expensive. Furthermore, Plaintiffs do not demonstrate that the costs to arbitrate which would be assumed by each Plaintiff are a more significant deterrent to proceeding with their claims than raising the same claims in federal court. Accordingly, enforcing the License Agreement's requirement that the Plaintiffs arbitrate their dispute does not foreclose the vindication of Plaintiffs' rights and the arbitration clause is not unconscionable. *See Harrington*, 211 Ariz. at 252-53 (refusing to find fees substantively unconscionable when litigant failed to "show arbitration will put them in any worse position than litigation," and noting the record was "speculative" with regard to the costs of arbitration).[7] *Compare Rizzio v. Surpass Senior Living LLC*, 248 Ariz. 266, 272 (Ariz. Ct. App. 2020), *review granted* (Aug. 25, 2020) (finding an arbitration agreement unconscionable where the agreement's cost shifting provision allocated "the payment of all costs, fees, and expenses [or arbitration] to plaintiff, even if she prevails," and comparing cases where the allocation of arbitration costs and expenses were unstated).  *See also Coup*, 823 F. Supp. 2d at 954-55.

Plaintiffs also assert the parties' agreement was a contract of adhesion. "An adhesion contract is offered on essentially a take it or leave it basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired . . . services except by acquiescing in the form contract." *Rizzio*,

---

[7] The *Harrington* court noted:
The appellees who provided affidavits assert that even $1,000 in costs would preclude them from arbitrating their case. Appellees do not explain how they expect to litigate (as opposed to arbitrate) claims of $500,000 to $1,000,000 for less than $1,000 in costs. One obvious possibility is that an attorney would take the case on a contingency basis and advance costs. That same possibility would apply to arbitration.
*See Harrington*, 211 Ariz. at 253.

1    248 Ariz. at 271 (internal quotations omitted), *citing Duenas*, 236 Ariz. at 137-38. Because

2    the Plaintiffs in this matter had a clear choice whether to be treated as employees or whether

3    to be considered independent contractors, and the License Agreement provided that at any

4    time Plaintiffs could change the designation of their status or, indeed, opt-out of the

5    arbitration provisions, the License Agreement was not a "take it or leave it" contract and

6    not a contract of adhesion. Furthermore, the mere existence of an adhesion contract does

7    not signify unconscionability. *See Longnecker*, 23 F. Supp. 3d at 1108-09, *cited in Bufford*

8    *v. VXI Global Sol. LLC*, 2021 WL 229240, at *7 (D. Ariz. Jan. 22, 2021).

9         Section 3 of the FAA commands the district courts to "stay the trial of the action

10   until such arbitration has been had in accordance with the terms of the agreement." *See*

11   *also Tillman v. Tillman*, 825 F.3d 1069, 1075 (9th Cir. 2016) (characterizing § 3 of the

12   FAA as a mandate "that district courts must stay pending proceedings on issues subject to

13   arbitration until such arbitration has been had"). Because Plaintiffs Chavez, Noice, and

14   Garcia's claims are subject to arbitration, the Court will stay this matter with regard to

15   these Plaintiffs' claims pending the conclusion of arbitration. *See Scott-Ortiz v. CBRE Inc.*,

16   ___ F. Supp. 3d ___, 2020 WL 6781272, at *9 (D. Ariz. Nov. 18, 2020).[8] *See also Price v.*

17   *HotChalk, Inc.*, 2010 WL 5137896, at *4 (D. Ariz. Dec. 10, 2010) (citing *Bushley v. Credit*

18   *Suisse First Boston*, 360 F.3d 1149, 1153 n.1 (9th Cir. 2004) and noting that dismissal is

19   an order appealable under 9 U.S.C. § 16(a) (3), while the granting of a stay is an

20

21   _____

22        [8] The Court notes that some pre-*Tillman* Ninth Circuit decisions suggest that district
23   courts have discretion to "stay or dismiss" an action in which the parties have been
     ordered to arbitrate. *See, e.g., Kam-Ko Bio-Pharm Trading Co. Ltd.-Australasia v.*
24   *Mayne Pharma (USA) Inc.*, 560 F.3d 935, 940 (9th Cir. 2009) ("If the court finds
     that an arbitration clause is valid and enforceable, the court should stay or dismiss
25   the action to allow the arbitration to proceed."); *Sparling v. Hoffman Const. Co.*,
     864 F.2d 635, 638 (9th Cir. 1988) (rejecting argument that "the provision for stay
26   in 9 U.S.C. section 3 is the defendant's only remedy where there is an arbitration
     clause"). Nevertheless, those cases don't mandate dismissal and the Court
27   concludes, to the extent it retains discretion to choose between remedies in this
     scenario, that a stay rather than dismissal is appropriate.
28   *Scott-Ortiz v. CBRE Inc.*, ___ F.3d ___, 2020 WL 6781272, at *9 n.3 (D. Ariz. Nov. 18, 2020).

1   unappealable interlocutory order under § 16(b), and that "unnecessary delay of the arbitral

2   process through appellate review is disfavored.").

3       Furthermore, Defendants' motion will be granted insofar as it seeks to dismiss

4   Plaintiff Hawkins' claims. Defendants contend Plaintiff Hawkins never worked for

5   Defendants. This allegation implies Plaintiff Hawkins has neither Article III standing nor

6   statutory standing to bring a FLSA claim against Defendants. Article III standing is

7   properly presented as a challenge to jurisdiction under Rule 12(b)(1) and statutory standing

8   is properly presented as a Rule 12(b)(6) challenge to the adequacy of the complaint to state

9   a claim on which relief may be granted. *See Lexmark Int'l, Inc. v. Static Control*

10  *Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) ("[T]he absence of a valid . . . cause of

11  action does not implicate subject-matter jurisdiction, i.e., the court's statutory or

12  constitutional power to adjudicate the case.").

13      The Supreme Court has instructed the federal courts to address the issue of

14  Article III standing prior to addressing the issue of statutory standing. *E.g.*, *Steel Co. v.*

15  *Citizens for a Better Environment*, 523 U.S. 83, 95-98 (1998); *Miller v. Nissan Motor*

16  *Acceptance Corp.*, 362 F.3d 209, 221 n.16 (3d Cir. 2004).

17      . Because the issue of constitutional standing is properly presented in a Rule

18  12(b)(1) factual challenge, the Court may consider materials outside of Plaintiffs'

19  Complaint. *E.g.*, *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

20  "Once the moving party has converted the motion to dismiss into a factual motion by

21  presenting affidavits or other evidence properly brought before the court, the party

22  opposing the motion must furnish affidavits or other evidence necessary to satisfy its

23  burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch.,*

24  *Dist. No. 205*, 343 F.3d 1036, 1039-40 & n.2 (9th Cir. 2003).

25      To meet the "irreducible constitutional minimum" of Article III standing, a plaintiff

26  invoking federal jurisdiction bears the burden of establishing three elements. *E.g.*, *Lujan v.*

27  *Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must establish they

28  have suffered an "injury in fact," i.e., a concrete and particularized invasion of a legally

protected interest. *Id.* The plaintiff must also establish a "causal connection" between their injury and a specific action of the defendant. *Id.* The plaintiff must also show a likelihood "that the injury will be redressed by a favorable decision." *Id.* at 561. (internal quotation marks omitted).

Defendant Zanzucchi asserts under penalty of perjury that, despite "an exhaustive review of the Club's records," Defendants have "verified" that Defendant Hawkins never performed at Bandaids. (ECF No. 13 at 2). Plaintiffs argue:

> Defendants have failed to produce a valid arbitration agreement signed by Hawkins and therefore cannot not compel her claims to arbitration. Additionally, Defendants' self-serving declaration from Defendant Zanzucchi is insufficient to dismiss Hawkins from this action. The fact that Defendants were incompetent in their record keeping and cannot produce evidence of Hawkins working at Defendants' club is not proper grounds for dismissing her claims.

(ECF No. 21 at 2).

Defendants have done more than make a "self-serving declaration" that Hawkins was never an entertainer at Bandaids, either in the capacity of an employee or as an independent contractor. Defendant Zanzucchi avers under penalty of perjury:

> 18. The Club enters into and maintains Selection Documents and Agreements, such as those attached hereto as Exhibits A-F [i.e., the Business Status Election and the License Agreement], in the ordinary course of its business. The Agreements are created on or about the date stated thereon.
> 19. Bandaids' staff and I have conducted a diligent search for any record of Daphne Hawkins having performed on the Premises.
> 20. Bandaids maintains physical records, by day, of the entertainers who perform on the Premises.
> 21. Bandaids maintains an electronic point of sale (POS) system. Since at least 2018, all entertainers who have performed on the premises have been entered into this POS system, including their legal name (as shown on an entertainer's identification).
> 22. I am informed by Plaintiffs' complaint that Daphne Hawkins ("Hawkins") generally alleges to have performed upon Bandaids' Premises at some point "from approximately 2017 until approximately 2020."
> 23. Bandaids has searched its daily records from July of 2017 though present for any record of Daphne Hawkins.

24. Bandaids has searched its Agreements with entertainers for any record of Daphne Hawkins.

25. Bandaids has searched its POS system for any record of Daphne Hawkins.

26. Despite having conducted this diligent search of its records, Bandaids has uncovered no evidence of Hawkins having performed on its premises since July of 2017.

27. It is not possible for Hawkins to have performed on Bandaids' premises without Bandaids having records of the same.

(ECF No. 13-1 at 4-6).

These statements reveal that Defendants were not "incompetent in their record keeping." Notably, Defendants have produced contractual agreements signed by all other Plaintiffs regarding their performances at the Club. Plaintiff Hawkins submits no evidence beyond the allegations in the Complaint establishing any business relationship with, or appearances at, the Club and, therefore, she fails to meet her burden of establishing Article III standing. Plaintiff Hawkins' electronic signature on a form consenting to be represented by Plaintiffs' counsel, attached to the Complaint, is insufficient to establish, by a preponderance of the evidence, a factually plausible claim of subject matter jurisdiction, i.e., that she sustained an "injury in fact" as the result of a specific action by Defendants. Notably, the Complaint is not verified by Plaintiff Hawkins nor any other Plaintiff. Accordingly, Plaintiff Hawkins' claims against Defendants will be dismissed without prejudice. Should Plaintiff Hawkins provide some substantive evidence that she did work for Defendants, i.e., a W-2, a W-4, a 1099 form, or a 1040 form indicating she has declared income earned at the Club during the relevant time frame, she may move for reconsideration of the dismissal of her claims.

Therefore,

**IT IS ORDERED that** Defendants' motion at ECF No. 13 is **granted** insofar as Plaintiff Hawkins' claims against Defendants are all **dismissed without prejudice**.

**IT IS FURTHER ORDERED that** Defendants' motion at ECF No. 13 is **granted** insofar as it asks the Court to stay this matter and order Plaintiffs Garcia, Chavez, and

Noice to proceed to arbitration with regard to all of the claims stated in Complaint, and Plaintiffs Garcia, Chavez, and Noice are **ordered** to proceed to arbitration with regard to all of the claims stated in Complaint. The motion is **denied** to the extent it asks the Court to dismiss Plaintiffs Garcia, Chavez, and Noice's claims at this time for want of jurisdiction.

**IT IS FINALLY ORDERED that this matter is stayed for nine months** and the case may be dismissed thereafter absent a showing of good cause and the exercise of due diligence. Should the parties complete arbitration in less than nine months or should Plaintiffs wish to abdicate their claims for relief prior to the expiration of the stay, any party may promptly inform the Court of such and move to lift the stay or move for dismissal.

Dated this 12th day of February, 2021.

Camille D. Bibles
United States Magistrate Judge

- 22 -